## CARNEGIE STEEL CO. v. BYERS.

### (Circuit Court of Appeals, Sixth Circuit.   January 8, 1907.)

### No. 1,573.

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE MACHINERY—EVIDENCE—BURDEN OF PROOF.

In an action for injuries to a servant by alleged defective machinery, the servant must not only show that the machinery was defective and that the injury was due to the defect, but also that the defect was known to the master for a sufficient time to have enabled him to repair, or should have been known, if there had been due inspection according to the ordinary course of prudent employers.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 877, 888.]

2. SAME—RES IPSA LOQUITOR.

In an action for injuries to a servant by the alleged sudden raising of an elevator, caused by an alleged defect in the hydraulic cylinder, the mere fact of the accident was insufficient to establish negligence on the part of the master.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 881.]

3. SAME—EVIDENCE.

Evidence *held* insufficient to warrant a finding that the sudden raising of an elevator, by which the servant was injured, was caused by a defect in the appliances by which it was operated.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

C. A. Manchester, for plaintiff in error.

Charles Koonce, Jr., for defendant in error.

Before LURTON, SEVERENS and RICHARDS, Circuit Judges.

LURTON, Circuit Judge.   An action in tort for personal injury sustained by the plaintiff while in the service of the Carnegie Steel Company.   There was a jury, and verdict for the plaintiff and judgment thereon.

The question upon which the case must mainly turn is whether there was any evidence from which the jury might reasonably find the plaintiff in error negligent.   This question was saved by a motion, at the close of all the evidence, to instruct a verdict for the defendant below, and an exception reserved.   The facts necessary to be stated are these:   The defendant below is a steel manufacturing company.   The plaintiff was an employé engaged about the mixer house in the operation of an electric locomotive.   Cars, consisting, practically, of great metal ladles, set on wheels, were used for carrying molten iron from the furnaces to the mixer house for further steps in its conversion into steel.   These ladle cars were pulled from

the furnaces, over railway tracks, to the mixer house by a steam engine. There it was the business of plaintiff to take one such ladle car at a time and pull it on to the platform of an elevator, sometimes called a "jack," which platform was crossed by tracks connecting with the permanent way from the furnaces. When such a ladle car filled with molten metal was properly set upon the platform of the "jack," the elevator, upon a signal, would raise it up to an upper floor, where its contents would be emptied and the car lowered in same manner and returned to the furnaces. This elevator was operated by hydraulic pressure; the admission of water being regulated by valves controlled by a lever upon the top floor, under the management of a fellow servant, whose business it was to raise or lower the elevator as needed. These valves were of a standard kind, known as the "Aiken Valve." When in normal condition, the full pressure of water would raise the loaded platform slowly and with a steady motion. The plaintiff's petition states that on October 27th, about 8 p. m., it became necessary for him, in the performance of his duty, to move his electrical locomotive across this elevator platform, it being at rest, and that while doing so the platform, suddenly and with great force, and a jerky motion, rapidly arose from its position for some eight feet, thereby causing the front part of said locomotive to be raised with said jack, while the rear part was still upon the main track, whereby the said car was so tilted as to throw him with great force from his position in said locomotive, causing a severe injury. This result must have been a consequence of the operation of the lever controlling the power which operates the elevator, or of some defect in the valves by which water was admitted without the intentional movement of the lever opening and closing the valves. Confessedly, if the movement was due to the negligence of the employé in control of the lever, there would be no responsibility to the plaintiff, for it would be an injury due to the fault of a fellow servant. There was no evidence directly tending to show that the servant so in control of the lever had made any untimely movement. Indeed, he testified that at the time of the accident he was upon an errand in another part of the room, having left his lever at rest upon a center. Neither is there the slightest evidence of any defect in the lever, and no evidence tending to show that it might move automatically.

The specific negligence averred, and to which all of the evidence was directed, was that there was a defective valve, whereby water was permitted to pass through it, under pressure, in sufficient quantity to force the elevator up, and that the Carnegie Company had knowledge of such defective valve, or should have had knowledge if they had used due care in inspecting this elevator and its valves. Concerning the possibility that the lever above had been inadvertently or negligently handled, the circuit judge said to the jury that there was "no direct evidence" of such manipulation, though he very properly added that "the inference could be drawn from all the circumstances that it was in that way that the jack had been put in motion." In respect to the alleged defective valve, the court said:

"If from all the evidence in the case you are satisfied, by a preponderance of the evidence, that the cause of the elevation of the jack, resulting in the in-

jury, was some defective condition of the valve, whereby water was permitted to pass through it under pressure, and that it was not caused by any movement originating in the lever on the third floor, then I say to you that the fact that the water did so enter the valves and in consequence of this the jack rose * * * will permit an inference of negligence on the part of the defendant; that is to say, the circumstances of the jack rising under these conditions would itself speak, as the law puts it, and amount to primary proof of negligence on the part of the defendant."

Recurring to this, the learned judge later said:

"You are not permitted to guess or speculate as to the cause of the accident. The burden, as I said, is upon the plaintiff to show, by a preponderance of the evidence, what its cause was; but, if the plaintiff has shown such a condition of things as I have just referred to, then that shifts the burden to the defendant of showing, by a preponderance of the proof, that it was in the exercise of ordinary care."

We shall not stop to consider the objections to this charge based upon the fact that the plaintiff was an employé, and that, as between servant and master, there is no presumption of negligence from the mere proof of the happening of this accident. In such a suit it is not enough to show that there was a defective tool or machine and that the injury was due to such defect. The servant must go further, and show that the defect was known to the master for a sufficient time to have enabled him to repair, or should have been known, if there had been due inspection according to the ordinary course of prudent employers. Texas & Pacific Ry. Co. v. Barrett, 166 U. S. 617, 17 Sup. Ct. 707, 41 L. Ed. 1136; Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; Illinois Cent. Railroad Co. v. Coughlin, 132 Fed. 801, 802, 65 C. C. A. 101. In Cincinnati, etc., Ry. Co. v. South Fork Coal Co., 139 Fed. 528, 71 C. C. A. 316, 1 L. R. A. (N. S.) 533, we gave elaborate consideration to the circumstances under which the fact of negligence may be inferred from the nature of an accident, and noted the distinctions to be observed in applying the rule of res ipsa loquitur in suits between employers and servants and those in which liability to passengers or strangers is involved. It was not enough to show that this accident had occurred through an erratic and unexplainable rising of the elevator. That might have made a prima facie case of negligence in favor of a passenger or stranger: but the plaintiff was an employé, and the burden was upon him to show that this sudden erratic upward movement was due to some defect in the mechanism which was known, or should have been known, to the Carnegie Company, and which they had neglected to repair. The distinction referred to is pointed out in the cases cited above. The pinch of the case was, not only whether the plaintiff had shown a defective valve which might have produced such an unexpected and rapid movement as that described by the plaintiff, but also whether the defect was known° or might have been known if ordinary care had been exercised.

The court denied a request to instruct a verdict for the defendant evidently upon the theory that there was evidence from which the jury might infer that the trouble was due to a defective valve, and that, if they found that to be so, the burden would shift to the defendant to show that the defect was not known or discernible by

ordinary care. We find ourselves unable to discover evidence upon which a jury might reasonably ascribe plaintiff's injury to a defective valve. For this reason, it was error to refuse the instruction to find for the plaintiff in error. The plaintiff's pleading averred that the negligence of the defendant consisted in having "negligently omitted to repair the spools of said jack and the parts thereto belonging, including the leathers thereof, and permitted same to become so worn and out of repair that they did not operate in the manner for which they were intended and as a result permitted said jack, without being controlled by said lever, to rise. * * *" Counsel for defendant in error now insist that there was evidence that the spools were working loose, and expert evidence that under such conditions water would leak in and when the cylinders filled cause the jack to move up. We have given the facts a careful scrutiny, and are persuaded that if there be any evidence from which the jury might infer this movement of the jack which injured the plaintiff was due to a defective valve, and that the defect was known or might have been known by ordinary care in inspection, that such evidence is not such as in law would justify a finding for the plaintiff.

Plaintiff's injury occurred about 8 or 8:30 o'clock p. m., upon a Sunday night. He introduced as a witness one Seaborn, who, at the time of this accident, was second helper to the millwright foreman, Davis. Seaborn testified that about 6 o'clock p. m. of the day of the accident Davis said to him that the spools in jack No. 2, the one here involved, "had been reported working loose," and that witness and Ward, who was first helper, must go and see what could be done with them. Davis' statement that the spools of No. 2 were reported as working loose cannot establish the fact that they were loose. The evidence was competent only to show notice to Davis, if by other and substantive evidence it should appear that in fact the spools were "working loosely." Seaborn then testified that, in accordance with this order, he and Ward took out the spools after cutting off the pressure, but found "nothing wrong with them." This examination, if the witness is credible, occurred only about two hours before the accident. In passing, we may observe, though any question of credibility would be for the jury, that Davis denied that any such report as to the spools of jack No. 2 had ever been made to him or that he ever so told Seaborn, or that he directed either Seaborn or Ward to examine that valve. Although every one engaged on or about this elevator was examined, no one, including Ward, ever heard of any examination of this valve at 6 o'clock or at any other time during the afternoon of the accident, and all deny that the operation of the elevator could have been stopped for such a purpose without their knowledge. But, if Seaborn is to be credited at all, he not only does not testify that he found the spools working loose, but that he found nothing wrong with them. Thus, unless there is some other testimony as to the fact that the spools were working loosely, plaintiff had no case to go to the jury. The only other scrap of evidence is that of Ward, who Seaborn says made with him the examination before referred to. After denying that Davis ever told him of any reported

looseness of the spools of this valve or that he made any examination at 6 o'clock p. m., he says that the rule of the company was that these valves should be examined every Saturday or Sunday, and that under this general custom he made the usual weekly examination of the valves of No. 2 jack on Sunday morning about 8 o'clock a. m. Touching this, Ward said, after having his attention called to the day of Byer's injury:

"Q. What time did you go to work on that Sabbath?
"A. 6:30.
"Q. In the morning?
"A. In the morning.
"Q. You may state whether you made any inspection of the valve of the No. 2 jack that morning?
"A. Yes, sir; I fitted the spool up, put new leathers on.
"Q. About what time?
"A. Well, it was between 8 and half past 8.
"Q. That was in the morning?
"A. Yes, sir.
"Q. Now, tell the jury what you did in inspecting.
"A. Well, the leathers on these, we call them 'cups' sometimes—these cups get cut more or less, or would get soft, and I put all new cups on those valves and greased them and put them back in.
"Q. Did you remove the spools in making that inspection?
"A. Yes, sir.
"Q. Took off the nuts at the end, did you, of the spool?
"A. Yes, sir.
"Q. And put in new leathers?
"A. New cups; yes, sir.
"Q. Did you put in good leathers in those places?
"A. Yes, sir; we never used anything but good leathers?
"Q. Did you observe the condition of the valve; whether it was worn?
"A. Yes, sir; it was not an old valve. We hadn't used it very long.
"Q. Did you observe the condition of the slippers of the valve?
"A. Yes, sir.
"Q. And what was their condition?
"A. Well, there was a little lost motion on the top walking beam, but none to hurt it."

Ward also testified that after this examination he turned on the pressure and found that there was no leak whatever. The "slippers" referred to are rings of brass, one above and one below the spools, and are intended to save wear of the cast parts with which the ends of the spools otherwise come in contact. Whether the slight "lost motion," referred to by Ward, was the result of wear or some other cause, is not explained. Plaintiff's expert did express an opinion that the slippers might by wear leave a space between the top and bottom of these spools and the slippers, which would cause the spools to work loosely and bring about a leaky condition of the valves which might result in causing the jack to rise. But, if plaintiff's witness, Seaborn, is to be believed about an examination made by him two hours before this accident, there was then no loose working of the spools. If Ward is to be credited, and he is not contradicted, he put in new leathers at 8 o'clock on the morning of the day of the accident, and left the valve in good working condition; the slight lost motion he found in the slippers having no effect in causing the spools to work loose. If the spools of this valve were working loosely from as early as

the morning of this accident, it is not likely that the defect would display itself in a single erratic movement of the jack, or that the jack should resume normal operation immediately after and without any repairs. A loosely working spool resulting in a leak of water into the high pressure cylinder is a condition which is remedied only by replacements or repairs. The plaintiff's expert testified that a leak due to the loose working of the spools is a condition which will inevitably display itself by the automatic movement of the jack within a short time. The force of this evidence was felt, and plaintiff's counsel endeavored to modify it by this question:

"Q. And there can be a leakage which will cause the spools to work loose, can there, without causing the jack to rise immediately?

"A. No. That is, if there is a leakage in the spools for it to get to the cylinder, yes; it would cause the jack to rise, maybe not immediately, but a few seconds before it would take effect.

"Q. I want to know in a case where the spools are working loose in an appliance of this kind, they could not be working loose for a couple of hours without causing any rise in the jack?

"A. No; they could not be working loose without causing a rise."

The expert, Popewich, did, indeed, suggest conditions which might suddenly drop a spool below the intake port; but such conditions were not here shown to be present, and such evidence could only widen the field over which conjecture might range. There was absolutely no shred of evidence of torn or worn leathers, none of a worn cylinder, or the metal sleeves of the spools. The only scintilla of evidence touching any possibly worn part was in respect to the slippers. But they were metal, and, if worn so as to cause a loose up and down motion in the spools, the cause was continuing and not sporadic. Neither would a mere leaky condition due to worn leather or slipper produce so sudden and swift a rise in the jack as that described by plaintiff. The very character of it tends strongly to show that the full force of the pressure must have been suddenly thrown into the cylinder by such an opening of an inlet port as could result only from the operation of the lever controlling the valve. This seems to be established by the evidence of certain experts of an experiment made by producing a leaky valve by scoring a number of places in the leather washers and center spool, and then putting on the full pressure without opening a port. The result was that the jack was raised only one foot in 2 minutes and 40 seconds. Thus it is plain that a mere leaky condition would not occasion so sudden a rise as that claimed.

To repeat by way of summary, we are persuaded that the sudden rising up of this jack was not due to a defective valve: (1) By the absence of any affirmative evidence of such condition; (2) by the fact that the valve worked normally for hours prior to the accident; (3) by the fact that it worked normally immediately after the accident without repair; (4) by the fact that by an examination made either ten or two hours before the accident, or at both times, revealed no defective or leaky condition; (5) by the expert evidence that a leaky condition from loosely working spools would result in a slow rise and not a rapid one as that which occurred.

The indications, point very strongly to a premature movement of the lever by the servant who had charge of the movements of this jack, notwithstanding his statement that he was not near the lever. The burden, however, was upon the plaintiff to make substantive proof of some negligence—the omission of some duty which the defendant owed to him. It was incumbent upon him to show either that the jack was an improper appliance, or that the company had been negligent in keeping it in reasonably safe repair. Looney v. Metropolitan Railroad Co., 200 U. S. 480, 26 Sup. Ct. 303, 50 L. Ed. 561; Illinois Cent. R. R. Co. v. Coughlin, 132 Fed. 801, 803, 65 C. C. A. 101; Texas & Pacific Railroad Co. v. Barrett, 166 U. S. 617, 17 Sup. Ct. 707, 41 L. Ed. 1136. There was no substantial evidence from which the jury might reasonably find that this accident was due to negligence. Its cause is wrapped in doubt and uncertainty. It may have happened from some cause for which the defendant was not liable or from actionable negligence. It was the duty of the plaintiff to make a case from which a jury might reasonably find negligence. This it did not do.

Reverse, and award a new trial.