*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES D. SZEKERES,

        *Plaintiff-Appellant,*

    *v.*

CSX TRANSPORTATION, INC.,

        *Defendant-Appellee.*

No. 09-3835

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-01153—Ann Aldrich, District Judge.

Argued: June 10, 2010

Decided and Filed: August 16, 2010

Before: GILMAN and WHITE, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert B. Thompson, HARRINGTON, THOMPSON, ACKER & HARRINGTON, LTD., Chicago, Illinois, for Appellant. Joseph John Santoro, GALLAGHER SHARP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Robert B. Thompson, Laurence C. Acker, HARRINGTON, THOMPSON, ACKER & HARRINGTON, LTD., Chicago, Illinois, for Appellant. Joseph John Santoro, Holly M. Olarczuk-Smith, GALLAGHER SHARP, Cleveland, Ohio, for Appellee.

_____

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.  Plaintiff James Szekeres (Szekeres) appeals from the district court's order granting summary judgment to defendant CSX Transportation, Inc. (CSX) in this action brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, and the Locomotive Inspection Act (LIA), 49 U.S.C. § 20701.  For the reasons set forth below, we **REVERSE**.

**I**

The district court summarized the facts:

> Szekeres was hired as a brakeman for CSX on June 7, 1967.  In July 2005, Szekeres regularly worked on a local CSX freight operation that runs from Cleveland, Ohio to Valley City, Ohio and back.  The operation includes multiple stops along the route.  Szekeres was working this route on the date of his injury.

> On January 4, 2006, Szekeres reported to CSX's Clark Avenue office in Cleveland.  The outdoor conditions were cold with a misting rain, but not cold enough for snow and ice.  Engineer Matthew Ashby ("M. Ashby"), conductor Larry Ashby ("L. Ashby"), and trainmaster John Whittenberger ("Whittenberger") joined Szekeres as crew members for part of that day's run.  Although a restroom was available at CSX's Clark Avenue office, Szekeres does not remember using the restroom at that location.  The train departed Cleveland with two locomotives, each of which was equipped with a restroom, including a retention tank toilet. From Cleveland to the first stop in Parma, Ohio, Szekeres rode on the second locomotive while the rest of the crew rode on the lead locomotive.  Szekeres did not use the restroom located on the second locomotive.

> Once the train arrived in Parma, the crew removed the second locomotive from the train, and Whittenberger departed with the removed locomotive.  A CSX office building with a restroom was available to employees at the Parma stop, but Szekeres does not recall using the restroom at that location.  The train left Parma bound for Valley City with Szekeres riding on the lead locomotive, which was the only remaining locomotive.  During the trip from Parma to Valley City,

Szekeres did not need to use the restroom and did not inspect the locomotive's restroom.

Once the train arrived in Valley View, the crew had to turn the train around to return north to Cleveland. This process required a member of the crew, here Szekeres, to exit the locomotive and throw the switch to get the train back on the main line tracks. At some point between arriving in Valley View and exiting the locomotive to switch the track, Szekeres visually inspected the restroom on the locomotive. Szekeres claims the restroom was unsanitary because of an unspecified chemical odor and a dirty toilet seat, both of which prevented him from using the restroom onboard the locomotive. Szekeres claims that he alerted M. Ashby and L. Ashby as to the restroom's condition, but there is no evidence that either party checked the restroom.

After visually inspecting the locomotive's restroom, Szekeres exited the locomotive and walked to the switch. The walkway behind the switch, where Szekeres stood to operate the switch, was muddy, and Szekeres accumulated mud on his boots. He threw the switch and turned to walk up an inclined embankment to privately relieve himself among trees at the top. Like the walkway, the embankment was also muddy. Szekeres slipped while ascending the embankment and twisted his knee, allegedly injuring it. He claims that he slipped as a result of the mud that had accumulated on his boot from the muddy walkway behind the switch. He returned to the locomotive where he relieved himself next to the tracks. Szekeres boarded the train, returned to the Clark Avenue office, and reported the incident to a supervisor. He wrote a hand-written statement on the date of the incident and filed an official incident report six days later.

District Court Record Entry (R.) 31 at 1-3 (Dist. Ct. Memorandum & Order entered 7/2/09).

### A

This court reviews a district court's grant of summary judgment *de novo*. *Campbell v. Burlington Northern & Santa Fe Ry. Co.*, 600 F.3d 667, 671 (6th Cir. 2010). Claims brought under the LIA, formerly the Boiler Inspection Act (BIA), are actionable under the FELA. The FELA, 45 U.S.C. § 51, provides in pertinent part:

Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such

commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its . . . engines, . . . track, roadbed, . . . or other equipment.

Also relevant to our analysis is the explanation of FELA liability found in Randy J. Sutton, Annotation, *Construction and Application of Federal Employers' Liability Act (FELA), §§ 1 et seq., 45 U.S.C.A. §§ 51 et seq.– U.S. Supreme Court Cases*, 29 A.L.R. FED. 2D 1, § 2 (2008):

> Contributory negligence of an injured employee under FELA does not preclude a judgment for the employee, but the damages are to be diminished by the jury in proportion to the amount of negligence attributable to such employee, but no such employee shall be held to have been guilty of contributory negligence in any case where the common carrier shall have violated any statute enacted for the safety of employees that contributed to the injury or death of such employee (45 U.S.C.A. § 53). Similarly, assumption of risk is not a bar to recovery where the injury resulted in whole or in part from the carrier's negligence or where the injury or death resulted from the violation of a safety statute by the carrier (45 U.S.C.A. § 54). . . .
>
> . . . .
>
> In several cases the [Supreme] Court decided that violations of the Safety Appliance Acts, Boiler Inspection Act [now the LIA], and other statutes intended to promote safety were actionable under FELA, in some cases without any proof of negligence, and application of those Acts operated to prevent the defense of contributory negligence in FELA actions . . . .

**B**

The LIA, 49 U.S.C. § 20701 *et seq.*, provides in pertinent part:

§ 20701.  **Requirements for use**

> A railroad carrier may use or allow to be used a locomotive . . . on its railroad line only when the locomotive . . . and its parts and appurtenances --
> (1)   are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
(3) can withstand every test prescribed by the Secretary under this chapter.

A violation of the LIA is negligence *per se* under the FELA. *Mickler v. Nimishillen and Tuscarawas Ry. Co.*, 13 F.3d 184, 188 (6th Cir. 1993) (citing *Urie v. Thompson*, 337 U.S. 163, 188-89 (1949)).

49 C.F.R. § 229.137 requires that locomotives be equipped with a sanitation compartment/toilet facility that is adequately equipped. 49 C.F.R. § 229.139(a) requires that the sanitation compartment of all lead locomotives in use be sanitary. Section 229.5 sets forth definitions of "sanitary" and "unsanitary":

> Sanitary means lacking any condition in which any significant amount of filth, trash, or human waste is present in such a manner that a reasonable person would believe that the condition might constitute a health hazard; or of strong, persistent, chemical or human waste odors sufficient to deter use of the facility, or give rise to a reasonable concern with respect to exposure to hazardous fumes. Such conditions include, but are not limited to, a toilet bowl filled with human waste, soiled toilet paper, or other products used in the toilet compartment, that are present due to a defective toilet facility that will not flush or otherwise remove waste; visible human waste residue on the floor or toilet seat that is present due to a toilet that overflowed; and accumulation of soiled paper towels or soiled toilet paper on the floor, toilet facility, or sink; an accumulation of visible dirt or human waste on the floor, toilet facility, or sink; and strong, persistent chemical or human waste odors in the compartment.
>
> . . .
>
> Unsanitary means having any condition in which any significant amount of filth, trash, or human waste is present in such a manner that a reasonable person would believe that the condition might constitute a health hazard; or strong, persistent, chemical or human waste odors sufficient to deter use of the facility, or give rise to a reasonable concern with respect to exposure to hazardous fumes. Such conditions include, but are not limited to, a toilet bowl filled with human waste, soiled toilet paper, or other products used in the toilet compartment, that are present due to a defective toilet facility that will not flush or otherwise remove

waste; visible human waste residue on the floor or toilet seat that is present due to a toilet that overflowed; an accumulation of soiled paper towels or soiled toilet paper on the floor, toilet facility, or sink; an accumulation of visible dirt or human waste on the floor, toilet facility, or sink; and strong, persistent chemical or human waste odors in the compartment.

49 C.F.R. § 229.5.

## C

The district court concluded that Szekeres's allegations did not establish a breach of CSX's absolute duty under the LIA, noting that

> Szekeres' general allegations concerning the condition of the restroom fail to establish the existence of a CFR violation . . . . Without specific statements of fact supporting his allegations, Szekeres has failed to create a genuine issue of material fact. *See Barry v. CSX Transp., Inc.*, No. 5:05CV2073 (N.D. Ohio Oct. 13, 2006) (finding that plaintiff's mere assertion that a locomotive engine was improper and unsafe was not enough to withstand summary judgment).

R. 31 at 7.

Szekeres asserts that he presented a viable claim under both the LIA and 49 C.F.R. §§ 229.137 and 229.139 because his deposition testimony established that the locomotive's sanitation facility was unsanitary as defined in the CFR. He contends that had CSX provided a sanitary toilet facility, he would have used it, thus obviating the need to urinate outside, which led him to slip on the incline and injure his knee. Szekeres contends that the district court failed to view the facts in a light most favorable to him by not considering his uncontradicted deposition testimony regarding the condition of the toilet facility.

**1**

This court noted in *Richards v. Consolidated Rail Corp.*, 330 F.3d 428, 437 (6th Cir. 2003):

> Courts in . . . FELA and BIA [predecessor to the LIA] cases . . . should focus on whether a reasonable jury could conclude that the defective appliance played *any* part, even the slightest, in bringing about the plaintiff's injury. This means that if a reasonable jury could find that the plaintiff's injury "was within the risk created by" the defective appliance, the plaintiff's right to a jury trial should be preserved. For example, if as a result of a defective appliance a plaintiff is required to take certain actions and he or she is injured while taking those actions, the issue of causation generally should be submitted to a jury.

We agree with Szekeres that the district court failed to view the facts and reasonable inferences therefrom in his favor. Szekeres testified that the locomotive toilet facility was "dirty" and "unusable," was "Just dirty and smelly . . . they're old locomotives and they're not kept up," that the toilet seat was "dirty," and that "[y]ou have a chemical smell. It's just not a nice place and you don't know what you can catch out of it." Szekeres did not simply describe the toilet facility as "unusable." Rather, he provided two specific details: 1) that the toilet seat was dirty, and 2) that there was a chemical smell. The first detail gives rise to an inference that there was "a significant amount of filth, trash, or human waste" present such that a reasonable person might believe it constituted a health hazard, particularly when read in tandem with Szekeres's statement that "you don't know what you can catch out of it." The second detail supports the conclusion that there was a "strong, persistent, chemical . . . odor sufficient to deter use of the facility," given that Szekeres chose not to use the onboard toilet facility and instead opted to urinate outside.

Szekeres's testimony is sufficient to create a genuine issue of material fact. *See Myers v. Reading Co.*, 331 U.S. 477, 483 (1947) (holding that a plaintiff's testimony about the inefficiency of railroad equipment "is such substantial evidence of inefficiency as to make an issue for the jury." (citation omitted)); *Richards*, 330 F.3d at 433 ("Trial judges should not rule out plaintiffs' opinions as to why appliances functioned

inefficiently, where the plaintiffs' opinions are based on their experience and perceptions at the time of their accident.").

The district court properly observed that Federal Railroad Administration regulations allow for use of chemicals to clean sanitation compartments. *See* 49 C.F.R. § 229.139(b)(3). But to conclude that the chemical smell Szekeres testified to was from a cleaning chemical requires weighing the evidence and construing inferences contrary to Szekeres's testimony, neither of which is permitted at the summary judgment stage. The district court's observation that the toilet facility was inspected on December 10, 2005, and January 10, 2006, and that no problems were noted, is likewise not outcome determinative at the summary judgment stage. These inspections do not definitively establish the condition of the locomotive toilet facility on January 4, 2006, the day of the accident. We thus conclude that Szekeres provided sufficient evidence to survive summary judgment on the issue whether the toilet facility was sanitary.

**2**

CSX asserts that even if Szekeres had established a defect with the toilet facility, the causal connection between the alleged defect and injury is "too tenuous to impose absolute liability upon CSX as a matter of law." CSX maintains that although Szekeres could have urinated anywhere in the rural area and admitted that his job duties did not require that he walk up the incline, he chose to walk up a "real soft" muddy incline to get to a more private area.

On the question of causation, courts "focus on whether a reasonable jury could conclude that the defective appliance played *any* part, even the slightest, in bringing about the plaintiff's injury." *Richards*, 330 F.3d at 437 (emphasis in original). Although this is a close question, we conclude that there is a sufficient factual basis for a reasonable jury to conclude that Szekeres's injury "was within the risk created by" the unsanitary toilet facility. With the toilet facility being "unusable," Szekeres had no available indoor facility and was left to relieve himself outside. As James Arton, Szekeres's expert, stated in his affidavit, railroad employees typically "walk[] up the incline to seek privacy to relieve [themselves]" when other "toilet facilities are

unavailable."    Szekeres testified that he slipped from accumulated mud on his boots from both the area behind the switch and from climbing the embankment, so there is a direct tie between his inability to use the onboard toilet facility and his accident.

We thus conclude that the district court improperly granted summary judgment on Szekeres's LIA and C.F.R. claim.

**II**

Szekeres argued below that on January 4, 2006, he was assigned to work as a conductor and required to walk on the ground to operate railroad ground switches, that he sustained injury after being caused to step in mud, and that CSX thereby breached its duty to provide him with a reasonably safe place to work.  Szekeres asserted that CSX was also negligent in failing to use reasonably safe methods and procedures with regard to maintenance of the ground area where he was required to walk in performing his duties, in failing to properly inspect the area alongside the track when ordinary inspection would have disclosed that mud was present which could have been properly covered with walking ballast, and in failing to cover the mud with walking ballast when CSX knew or should have known and foreseen that trainmen like him would be in jeopardy of injury while performing their duties working in the area.

**A**

CSX's summary judgment motion argued that it did not have notice of the allegedly unsafe working condition (mud around the switch Szekeres was operating and working around on January 4, 2006) and thus Szekeres's injury was not foreseeable. The district court agreed and granted CSX summary judgment, concluding that Szekeres failed to establish a *prima facie* case of negligence under the FELA.  *See Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990) (holding that a FELA plaintiff asserting a cause of negligence against his employer must "prove the traditional common law elements of negligence:   duty, breach, foreseeability, and causation"); *Miller v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 317 F.2d 693, 695 (6th Cir. 1963)

(holding that actual or constructive notice to the railroad must be established under the FELA).

**B**

The law is clear that notice under the FELA may be shown from facts permitting a jury to infer that the defect could have been discovered by the exercise of reasonable care or inspection:

> Under familiar law, defendant could not be convicted of negligence, absent proof that such defect was known, or should or could have been known, by defendant, with opportunity to correct it. 56 C.J.S. Master and Servant § 244, p. 1000. *Carnegie Steel Co. v. Byers*, 149 F.667, 669 (C.A. 6, 1907); *Atlantic Coast Line R. Co. v. Collins*, 235 F.2d 805, 809 (C.A. 4, 1956) []. This rule is applicable to FELA actions where negligence is essential to recovery. The establishment of such an element, however, may come from proof of facts permitting a jury inference that the defect was discovered, or should have been discovered, by the exercise of reasonable care or inspection. 56 C.J.S. Master and Servant § 248, p. 1002. . . .

*Miller*, 317 F.2d at 695 (some internal citations omitted). The district court properly noted that notice under the FELA may be either actual or constructive; however, it did not address Szekeres's argument and proofs supporting his contention that CSX had *constructive* notice of the allegedly unsafe conditions around the switch he operated and worked around on January 4, 2006.

**C**

Szekeres contends that the evidence viewed in a light most favorable to him clearly establishes a triable issue of material fact as to whether CSX knew that: 1) there was a long-standing mud condition in the vicinity of the Valley City switch; 2) mud is recognized as a slipping hazard in the railroad industry; 3) walkway stone should be used to cover dirt in the ground areas around switches; and 4) company rules required Szekeres to be standing 10 or 30 feet behind the Valley City Switch, in an obvious area of dirt and mud. Szekeres contends that these facts alone established that CSX knew or should have known of the unsafe ground conditions that led to his injury.

We agree with Szekeres that he presented sufficient evidence of the first three points. Photos of the switch and surrounding areas, some of which were taken on the same day that Szekeres was injured, depict that there was some walking stone on the ground on *either side* of the switch (in the walkway area parallel to the track, which several CSX supervisory employees testified was, indeed, a walkway used by railroad employees), but very little *behind* the switch, where Szekeres actually stood while working and from where he testified that mud accumulated on his boots that contributed to him slipping on the incline and injuring his knee. Various CSX supervisory employees testified that the area behind the switch was mostly dirt, with little walking stone. It is undisputed that on January 4, 2006, the temperature was in the 40s and that it had been raining/misting all day. Trainmaster Whittenberger, Szekeres's supervisor, testified that he had been in the vicinity of the switch within 90 days before Szekeres's injury, and that the area looked the same as it did on January 4, 2006, when Szekeres was injured.

On the second point, several CSX supervisors testified that mud is, or can be, a slipping hazard, as did Szekeres. It is clear that Szekeres had to stand in the area behind the switch to perform his work responsibilities--throwing the switch.

On the third point, the report of James Arton, Szekeres's expert,[1] stated:

> CSXT failed in its non-delegable duty to use ordinary care to provide Szekeres with a reasonably safe place to work. CSXT is required to provide Szekeres with a reasonably safe place to work and is required to correct unsafe conditions and practices.
>
> CSXT failed to maintain the area in the vicinity of the mainline switch to Liverpool Coil at Valley City, Ohio in a safe condition. The location where Szekeres's duties required him to walk, stand and operate the switch was not provided with proper walking stone to eliminate the mud condition that existed at the locations where Szekeres was required to perform service in the normal course of his duties. Szekeres stated

---

[1] Arton has more than 30 years of experience as a railroad operations manager, including experience in railroad operations and safety. His experience includes positions as yardmaster, trainmaster, and terminal superintendent, and he is familiar with railroad industry standards regarding use of ballast in the ground areas surrounding railroad switches, as well as common behavior of train service employees assigned to industrial switching. R. 23-6 at 1-2 (Arton affidavit).

(Szekeres deposition page 29, lines 1-14 and photographs) that his boots became encrusted with mud at this location and when he attempted to walk up the slight incline the muddy boots contributed to his injury.

Szekeres walking up the incline to seek privacy to relieve himself is reasonable and consistent when an employee in the field needs to relieve themselves [*sic*] and toilet facilities are unavailable.

CSXT should have identified and corrected the unsafe condition at the switch that caused the injury to Szekeres, his injury could have been prevented.  [R. 24-6 at 2.]

Szekeres thus presented sufficient evidence of CSX's constructive notice of the muddy conditions surrounding the switch to survive summary judgment.

For the foregoing reasons, we **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.