# STATE OF MICHIGAN

# COURT OF APPEALS

JASON REINEKE,

        Plaintiff-Appellee,

v

GRAND TRUNK WESTERN RAILROAD
COMPANY,

        Defendant-Appellant.

UNPUBLISHED
January 25, 2018

No. 331878
Wayne Circuit Court
LC No. 14-015048-NO

Before: JANSEN, P.J., and FORT HOOD and RIORDAN, JJ.

PER CURIAM.

In this Federal Employers' Liability Act (FELA), 45 USC 51 *et seq.*, action, defendant, Grand Trunk Western Railroad Company, appeals as of right the trial court's judgment on the $75,000 jury verdict in favor of plaintiff, Jason Reineke. For the reasons stated herein, we affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Defendant hired plaintiff to work as a brakeman in 2001. Shortly thereafter, plaintiff was promoted to train conductor, which required him to move freight, give engineers instructions regarding moving freight, assemble and disassemble train cars in the rail yard, and provide general rail service and maintenance.

Plaintiff worked the "Hump 120" shift at defendant's Flat Rock Yard site, which required plaintiff to separate and categorize train cars coming into the yard. A portion of plaintiff's job duties required him to throw manual track switches in order to separate sections of train cars and move them onto different tracks. Plaintiff would throw the track switches, and once they were properly aligned, he would pull a lever that would raise the pin holding the sets of train cars together. After the pin was raised, the appropriate section of cars would separate from the rest of the train, and then hit the other end of a plateau that the train cars were resting on. Using gravity to roll down the hill, the train cars would follow the proper rail route, created by throwing various rail switches, to the preselected track.

Plaintiff testified at trial that some of the pin levers would require him to pull multiple times before the pin would raise. During some of those pulls, the pin lever would come to an abrupt stop causing vibrations to travel though the lever into plaintiff's arm. Plaintiff testified

-1-

that when a pin was functioning properly, there was little resistance. However, when plaintiff pulled a malfunctioning lever, he had to flex his wrists and try multiple times. Occasionally, some of the track switches would be difficult to throw. If the track switch was poorly maintained, i.e., not adequately lubricated, it required approximately 40 pounds of force to throw and plaintiff would have to use both hands, flex his wrists, and use a great deal of strength. Plaintiff would orally report issues with track switches and pin levels to his supervisors. If the track switch or pin lever was so poorly maintained that it would be either entirely inoperable or would risk immediate physical injury, plaintiff would refuse to operate it.

In 2010, plaintiff began experiencing numbness and tingling in his hands after working as a conductor.[1] In 2011, plaintiff finally went to see Dr. Manish R. Gupta, a plastic, reconstructive, and general surgeon in Ohio after his numbness and tingling turned to pain. Dr. Gupta performed clinical tests to determine if plaintiff was suffering from carpal tunnel syndrome (CTS). Dr. Gupta eventually sent plaintiff to Dr. David Szymanski for further testing. Dr. Szymanski, a board certified neurologist, performed a nerve conduction test and an electromyography (EMG) on plaintiff's hands and wrists. These tests indicated that plaintiff was suffering from moderate bilateral CTS. Dr. Gupta recommended surgery to alleviate plaintiff's symptoms. Surgery was performed, after which Dr. Gupta was able to confirm plaintiff's CTS diagnosis. Upon returning to work, plaintiff used anti-vibration gloves when working in the rail yard, and his symptoms of numbness, pain, and tingling never returned.

On November 21, 2014, plaintiff brought the instant action under FELA, a federal statute enacted by the United States Congress to "provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or their federal employees." *Atchison, Topeka & Santa Fe R Co v Buell*, 480 US 557, 561; 107 S Ct 1410; 94 L Ed 2d 563 (1987). Plaintiff alleged that defendant had failed to provide a reasonably safe work environment, which caused his CTS. Specifically, plaintiff claimed that defendant had a statutory duty to properly maintain the pin levers, as required by the Federal Safety Appliance Act (FSAA), 49 USC 20302 *et seq.*, and that defendant was negligent in performing that duty, as well as maintaining the track switches.

Defendant filed two motions for summary disposition pursuant to MCR 2.116(C)(10). Defendant first argued that it did not have actual notice of the alleged negligent state of the pin levers and track switches, which plaintiff was required to prove to succeed on its claim brought under FELA. Defendant also argued that there was no admissible evidence that its alleged negligence caused plaintiff's CTS. Specifically, defendant took issue with the expert witness opinion testimony on causation from Dr. Gupta and Dr. Steven Newman, a specialist in neurology familiar with the diagnosis and treatment of CTS, who had performed a differential diagnosis on plaintiff. The trial court denied both motions, determining that causation and notice were both questions for the jury.

---

[1] We note that in 2011, plaintiff accepted a position with his workers' union, which required him to work outside of the rail yard three to four days per week.

As the case proceeded toward trial, plaintiff and defendant filed numerous motions in limine. Relevant to the present case, defendant moved the trial court to preclude plaintiff's medical experts from testifying about causation in Motion in Limine Number 10. Defendant once again provided the same argument regarding the allegedly insufficient factual and scientific foundation on which the expert witnesses relied. The trial court denied Motion in Limine Number 10, and opined that it would not preclude the testimony of plaintiff's medical experts regarding causation because they failed to use defendant's preferred catchwords, but noted that defendant could object to the doctors' testimony at trial when the foundation had been laid out before the jury.

Trial commenced on February 1, 2016. After the close of the plaintiff's case-in-chief, defendant made a motion for directed verdict, once again arguing that plaintiff's expert wtiness testimony on causation amounted to speculation and conjecture, which was not enough to go to the jury on the issue of defendant's negligence. Defendant also argued that there was no evidence of notice, for the same reasons raised in its motions for summary disposition, which also required a directed verdict in favor of defendant. The trial court denied defendant's motion.

After hearing all of the evidence, the jury determined that the faulty pin levers violated the FSAA, which caused, in part, plaintiff's injuries. The jury also found that defendant was negligent with respect to plaintiff, and that plaintiff's injuries were caused, at least in part, by defendant's negligence. The jury then found that plaintiff was also negligent, and that his own negligence caused some of his injuries. The jury indicated that 45% of the negligence that led to plaintiff's CTS was attributable to plaintiff. Finally, the jury found that plaintiff suffered $75,000 in damages. The trial court entered a judgment on that verdict on February 17, 2016. This appeal followed.

## II. EXPERT WITNESS OPINIONS

Defendant argues the trial court committed error requiring reversal by denying its motion in limine to bar Dr. Gupta and Dr. Newman's expert witness testimony on causation. We disagree.

We review a trial court's evidentiary decisions for an abuse of discretion. *Mitchell v Kalamazoo Anesthesiology, PC*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 331959); slip op at 3. "A trial judge abuses the court's discretion when the judge selects an outcome that is outside the range of principled outcomes." *Id*. (citation omitted). Further, "questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules," are reviewed de novo. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).

Although FELA cases filed in state court require trial courts to rely on federal substantive law, "questions of procedure and evidence [are] to be determined according to the law of the forum [state]." *Chesapeake & Ohio R Co v Kelly*, 241 US 485, 491; 36 S Ct 630; 60 L Ed 1117 (1916). Indeed, MRE 702 and MCL 600.2955 govern the admissibility of expert witness testimony.

MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Accordingly, MRE 702 requires trial courts to act as gatekeepers with respect to admitting scientific, technical, or other specialized evidence, and must ensure that expert witness testimony is reliable. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), citing *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Additionally, MCL 600.2955 provides, in relevant part:

(1) In an action for . . . injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

-4-

Although a trial court "shall consider all of the factors listed in MCL 600.2955(1)," *Clerc v Chippewa Co War Mem Hosp*, 477 Mich 1067, 1068; 729 NW2d 221 (2007), not all seven factors are relevant in every case. *Elher*, 499 Mich at 27. So long as all seven factors are *considered* by the trial court, the "statute does not require that each and every one of those seven factors must favor the proffered testimony." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 137; 732 NW2d 578 (2007) (opinion by DAVIS, J.)

The trial court's inquiry when determining admissibility of expert witness testimony is not "whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting *Chapin*, 274 Mich App at 139 (opinion by DAVIS, J.) Indeed, this Court has previously determined that "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217, quoting *Chapin*, 274 Mich App at 139 (opinion by DAVIS, J.) Rather,

> [t]he standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony. An expert's opinion is admissible if it is based on the "methods and procedures of science" rather than "subjective belief or unsupported speculation." [*Unger*, 278 Mich App at 217-218 (citation omitted), quoting *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993).]

Put simply, the role of the trial court as gatekeeper is merely to "ensure that the trier of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science." *Chapin*, 274 Mich App at 139 (opinion by DAVIS, J.)

Dr. Gupta and Dr. Newman's proffered testimony regarding causation was far from "masquerading as science." In fact, the expert witness testimony presented by Dr. Gupta and Dr. Newman is the type of expert witness testimony properly relied on by trial courts every day. Carpal tunnel syndrome (CTS) is not a unique or unusual injury or illness. Dr. Gupta is a board certified general surgeon and board certified plastic surgeon who regularly encounters and treats patients with CTS, including plaintiff. When treating plaintiff, Dr. Gutpa relied on his own experiences treating patients with CTS, the medically recognized causes of CTS, and the results of plaintiff's EMG test, which indicated that plaintiff was suffering from moderate bilateral CTS.

Dr. Gupta's opinion on causation in this matter was given in response to a hypothetical in which certain facts were "assumed." Generally, an expert opinion on causation that is solely "based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury." *Teal v Prasad*, 283 Mich App 384, 394-395; 772 NW2d 57 (2009). However, if a hypothetical is based upon "*specific* facts that would support a reasonable inference of a logical sequence of cause and effect," there is no error. *Id*. (emphasis added.) There must be facts in evidence to support an expert witness' opinion. *Id*. at 395.

The hypothetical posed to Dr. Gupta assumed facts actually testified to by plaintiff.[2] Namely, plaintiff testified that in the course of his employment, he was required to throw railroad switches and levers, and sometimes those switches were jammed, or stopped, or otherwise improperly maintained. Therefore, to operate those switches and levers required plaintiff to use "extra force multiple times" while his wrists were in an awkward, or flexed, position. Those specific facts, actually testified to by plaintiff, when considered alongside Dr. Gupta's personal knowledge of CTS, as well as Dr. Gupta's personal knowledge of plaintiff's medical history, assisted Dr. Gupta in forming an opinion on causation.

Likewise, Dr. Newman, who conducted a differential diagnosis on plaintiff, is a board certified neurologist with an impressive CV, who also specializes in physical medicine and rehabilitation, and diagnoses and treats patients with CTS on a daily basis. Dr. Newman relied on his extensive experience treating patients with CTS when he testified that, "the most common cause of carpal tunnel syndrome in our society is constant or repetitive activities of an industrial nature, assembly line nature, heavy equipment operation, vibration and the like." Dr. Newman also took into consideration plaintiff's testimony and medical history when concluding that plaintiff's work-related activities caused, or at the very least contributed to, plaintiff's CTS.

In concluding that the trial court failed to act as gatekeeper, the dissent seems to suggest that the methodology used by Dr. Gupta and Dr. Newman does not provide an adequate foundation for their expert opinion. However, we conclude that the methodology used by Dr. Gupta and Dr. Newman was thorough. Both experts took into consideration the medically accepted causes of CTS, their personal experience diagnosing and treating patients with CTS, plaintiff's medical history, including results of an EMG and a post-surgical diagnosis, as well as plaintiff's work history. Short of going out into the field, so to speak, and personally investigating the force required to throw railroad switches or levers, it is unclear what methodology, exactly, would be required to bolster the foundation of Dr. Gupta and Dr. Newman's testimony. Placing such an expectation on a medical expert regarding a run of the mill case of CTS is unreasonable, inconsistent with Michigan jurisprudence, and frankly ridiculous.

---

[2] During Dr. Gupta's deposition, defense counsel objected to Dr. Gupta's opinion on causation because "there's no foundation for the doctor's answer, it calls for speculation, and it's based on facts not in evidence." Similarly, during Dr. Newman's deposition, defense counsel objected to Dr. Newman's opinion on causation on the basis that "there's no foundation and [it] calls for speculation." By the time Dr. Gupta's and Dr. Newman's video depositions were played at trial, plaintiff's testimony had cured all foundational issues raised during Dr. Gupta's and Dr. Newman's depositions, rendering defense counsel's objections moot. See MRE 703, which states in relevant part: "The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." Accordingly, to the extent that defense counsel objected to Dr. Gupta's and Dr. Newman's causation opinions at trial on the basis that they lacked a scientific or legal foundation, those objections may be unpreserved.

We further note that with respect to causation, the jury clearly determined that plaintiff's own negligence contributed to his injuries. Specifically, the jury verdict form reflects that the jury found plaintiff was 45% comparatively negligent in causing his own injuries. It is likely that the jury's finding regarding plaintiff's comparative negligence was in response to defendant's *own expert witness testimony* on causation. Assuming *arguendo* that the trial court did abdicate its gatekeeping responsibilities, defense counsel was able to produce their own experts to testify regarding causation, and the jury was able to consider the two conflicting causation theories. Accordingly, any error would be harmless, and does not warrant appellate relief. See *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 76; 864 NW2d 296 (2004), citing MCR 2.613(A) and MRE 103(a) (quotation marks and brackets omitted), where our Supreme Court articulated that "any error in the admission or exclusion of evidence will not warrant appellate relief unless refusal to take this action appears . . . inconsistent with substantial justice, or affects a substantial right of the opposing party."

We believe that the dissent would agree that it would be refreshing to see trial courts more frequently fully articulate their reasoning behind evidentiary or procedural rulings. However, even on the record before us, we cannot conclude that it was outside the range of principled outcomes to deny defendant's motion in limine regarding Dr. Gupta's and Dr. Newman's opinions on causations, particularly when doing so would vacate an otherwise sound jury verdict, and any error on the part of the trial court was, in fact, harmless.

Briefly, we note that we find the dissent's discussion of a Federal circuit split regarding the admissibility of expert witness testimony regarding causation in cases involving FELA to be confusing. As noted *supra*, the trial court was required to apply substantive federal law, but because plaintiff brought his case in state court, Michigan procedural and evidentiary rules applied. This principle is elementary civil procedure. What any federal court may have concluded regarding the admissibility of evidence, or how any federal court may have interpreted Michigan law, is immaterial. Regardless, even if this Court were to look to the Federal circuit courts for guidance or illustration, it would not rely on the Seventh Circuit, particularly where the Sixth Circuit, which is routinely exposed to Michigan procedural and evidentiary law, has addressed this exact issue. See *Handyman v Norfolk & Western R Co*, 243 F 3d 255, 265 (CA 6, 2001), where the Sixth Circuit concluded that requiring a plaintiff to establish "a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad breakmen [would] essentially . . . foreclose plaintiffs from recovering for CTS against negligent employers unless their particular job has been the subject of a national, epidemiological study on CTS."

Further, the dissent ignores a recent case from the United States District Court for the Eastern District of Michigan involving the same defendant in this case defending a similar FELA action from a former employee who developed osteoarthritis (OA) in his knees due to his working conditions. See *Dixon v Grand Trunk Western R Co*, 259 F Supp 3d 702 (ED Mich, 2016). In *Dixon*, Defendant raised similar arguments relating to the lack of scientific foundation supporting plaintiff's expert witness testimony regarding causation. *Id*. at 708-709. The United States District Court for the Eastern District of Michigan, citing *Handyman*, determined that expert witness opinions on causation were properly admitted where plaintiff's expert spoke with the plaintiff, evaluated the plaintiff's work history and medical history, and then, relying on the expert's own experience treating patients with OA, determined that the "those motions

-7-

[performed by the plaintiff in the course of his employment with defendant] could likely cause the sort of OA from which [the plaintiff] suffers." *Id*.

### III. DENIAL OF SUMMARY DISPOSITION

Defendant next argues that the trial court erroneously denied its motions for summary disposition and its motion for directed verdict. We disagree.

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Bergman v Cotanche*, 319 Mich App 10, 15; 899 NW2d 754 (2017). This Court's review of a trial court's decision regarding a directed verdict is also reviewed de novo. *Conlin v Upton*, 313 Mich App 243, 254; 881 NW2d 511 (2015). "When deciding a motion for directed verdict, the evidence and all legitimate inferences are viewed in the light most favorable to the nonmoving party." *Chelik v Capitol Transp, LLC*, 313 Mich App 83, 88-89; 880 NW2d 350 (2015). "Such a motion should be granted only if the evidence viewed in this light fails to establish a claim as a matter of law." *Id*. at 89 (internal quotation marks omitted).

We first address defendant's summary disposition related claims. Below, defendants moved for summary disposition under MCR 2.116(C)(10). "A motion for summary disposition brought pursuant to MCR 2.116(C)(10) tests the factual support for a claim." *Patrick*, ___ Mich App at ___; slip op at 4 (citation omitted). Under MCR 2.116(C)(10), the pleadings, admissions, and other evidence submitted by the parties is viewed in a light most favorable to the nonmoving party. *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "It is well settled that the [trial] court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition. Moreover, a [trial] court may not make findings of fact; if the evidence before it is conflicting, summary disposition is improper." *Patrick*, ___ Mich App at ___; slip op at 5 (brackets, quotation marks, and citations omitted).

Defendant's motion for summary disposition was premised on the argument that plaintiff failed to provide any credible evidence regarding causation, and that plaintiff failed to provide notice of the alleged improperly maintained track switches and pin levers, as required under FELA. The trial court denied defendant's motion, determining that causation was a question for the jury based on the expert testimony provided.

Under FELA,

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. 45 USC 51.

FELA's language on causation is "as broad as could be framed," and "the test of a jury case is simply whether the proofs justify with reason the conclusion that the employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *CSX Transp, Inc, v McBride*, 564 US 685, 691-692; 131 S Ct 2630; 180 L Ed 2d 637 (2011) (citations omitted). As previously discussed, plaintiff did provide credible evidence regarding

causation through the expert witness testimony of Dr. Gupta and Dr. Newman. Further, even without expert testimony on causation, plaintiff provided sufficient circumstantial evidence from which a reasonable jury may infer that defendant's negligence caused plaintiff's CTS. See *Rogers v Missouri Pacific R Co*, 352 US 500, 508; 77 S Ct 443; 1 L Ed 493 (1957), where the United States Supreme Court opined that "[t]he burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make th[e] inference" that the negligence of an employer played any part in causing the injury at issue.

In his deposition, plaintiff testified that he began to suffer from numbness and tingling in both hands after working a 10-hour Hump 120 shift, during which he would encounter a great deal of malfunctioning pin levers and insufficiently lubricated track switches. Plaintiff's numbness and tingling eventually progressed to pain, and he sought medical advice from Dr. Gupta. Dr. Gupta recommended plaintiff begin wearing anti-vibration gloves while at work, and sent him for further testing. Dr. Szymanski performed a nerve conduction test and an EMG, which lead to plaintiff's CTS diagnosis. Dr. Gupta confirmed that diagnosis after operating on both of plaintiff's wrists. Surgical intervention completely resolved plaintiff's symptoms. When plaintiff returned to work, he continued to wear the anti-vibration gloves, and his CTS symptoms did not return. Accordingly, a reasonable jury could have inferred from the aforementioned circumstantial evidence that plaintiff's use of the negligently maintained track switches and pin levers caused his CTS. Therefore, the trial court did not commit error requiring reversal by denying defendant's motion for summary disposition regarding causation.

Defendant also moved for summary disposition on the basis that plaintiff failed to provide the requisite notice of the alleged improperly maintained track switches and pin levers. The trial court denied defendant's motion for summary disposition, again finding notice to be a question for the jury. We agree.

Under FELA, defendant could not be found to be negligent "absent proof that [the defect complained of] was known, or should or could have been known, by defendant with opportunity to correct it." *Szekeres v CSX Transp, Inc*, 617 F3d 424, 430-431 (CA 6, 2010) (internal quotations omitted). "[N]otice under [   ] FELA may be either actual or constructive[.]" *Id*. at 431. "If negligence is proved, however, and is shown to have *played any part, even the slightest, in producing the injury*, then the carrier is answerable in damages even if the extent of the [injury] or the manner in which it occurred was not probable or foreseeable." *McBride*, 564 US at 703-704 (internal quotation marks and citations omitted.) Notice to a carrier need only include notice of the actual defect. *Id*.

Although defendant claims it was not provided with notice, in his deposition, plaintiff testified that he had informed management on multiple occasions that some track switches were too hard to throw because they were not sufficiently lubricated, and that there were malfunctioning pin levers that required multiple pins and were causing significant vibrations. This testimony plainly supports the trial court's conclusion that there was a question of fact for the jury regarding whether plaintiff provided defendant with actual notice of the alleged defects. Accordingly, the trial court did not commit error requiring reversal by denying defendant's motion for summary disposition.

Defendant's motion for directed verdict was also properly denied. At the close of plaintiff's proofs, defendant moved the trial court for a directed verdict of no liability, arguing that plaintiff failed to present sufficient evidence of causation, and likewise, failed to present evidence of notice. However, the evidence presented by plaintiff during his case-in-chief was identical to the evidence presented in response to defendant's motions for summary disposition, and created reasonable inferences that plaintiff's CTS was caused, at least in part, by defendant's negligence, and that defendant received actual notice. Accordingly, because plaintiff did not fail to establish his claim as a matter of law, defendant's motion for directed verdict was properly denied.

## IV. JURY INSTRUCTIONS

Finally, defendant argues the trial court abused its discretion by instructing the jury regarding assumption of risk. We disagree.

"We review a trial court's decision regarding jury instructions for an abuse of discretion." *Alfieri v Bertorelli*, 295 Mich App 189, 196; 813 NW2d 772 (2012). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). "[J]ury instructions must be reviewed as a whole, rather than extracted piecemeal to establish error in isolated portions." *Hill v Sacka*, 256 Mich App 443, 457; 666 NW2d 282 (2003) (internal quotation marks omitted). "There is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury." *Id*. at 457-458. Reversal is not required unless failing to do so would be "inconsistent with substantial justice." MCR 2.613(A).

In 1939, the United States Congress amended FELA to preclude employers from raising assumption of risk as a defense. See *Gottshall*, 512 US at 542-543. Accordingly, FELA now provides:

> In any action brought against any common carrier under or by virtue of any of the provisions of [FELA] to recover damages for injuries to . . . any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury . . . resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury . . . of such employee. [45 USC 54.]

However, FELA does allow for an employer to argue that a plaintiff's own negligence contributed to his or her injury, and that any jury award should be reduced by that amount. See 45 USC 53, which provides:

> In all actions . . . brought against any such common carrier by railroad under . . . any of the provisions of [FELA] . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the

damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.

"At common law, the distinction between assumption of the risk and contributory negligence is well-settled. Assumption of the risk arises out of the knowing and voluntary acceptance of a dangerous condition." *Butynski v Springfield Terminal R Co*, 592 F 3d 272, 279 (CA 1, 2010). Contributory negligence, meanwhile, "arises out of any careless act or omission on the plaintiff's part tending to add new dangers to [existing] conditions." *Id*. (internal quotation marks omitted; alteration in original). Put simply, plaintiff cannot be found to be negligent for continuing his work even while aware of defendant's negligent maintenance of the equipment being used. See *id*. Plaintiff does not assume the risk of defendant's negligence by continuing to do his job. 45 USC 54.

Defendant argues that the trial court committed error requiring reversal by instructing the jury on assumption of risk. "Jury instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Freed v Salas*, 286 Mich App 300, 327; 780 NW2d 844 (2009) (internal quotation marks omitted). The pertinent question to consider is whether, "on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008) (internal quotation marks omitted). "The statutory elimination of the defense of assumption of risk, when read to the jury in FELA cases where that 'defense' has been neither pleaded nor argued, serves only to obscure the issues in the case." *Heater v Chesapeake & Ohio R Co*, 497 F 2d 1243, 1249 (CA 7, 1974) (internal quotation marks omitted). However, where the issue of assumption of risk has been raised, and the jury might face confusion regarding the difference between contributory negligence and assumption of risk, the assumption of risk jury instruction is properly given in FELA cases. *Tersiner v Union Pacific R Co*, 947 F 2d 954 (CA 10, 1991).

The assumption of risk jury instruction was properly given by the trial court where defendant raised the issue during trial. While cross-examining plaintiff, defendant asked whether plaintiff personally chose to work the Hump 120 shift, even though his seniority may have afforded him the opportunity to work a less "stressful" position. Further, during closing arguments, defendant made the following statement to the jury:

> [Plaintiff] also could have worked in the shanty if he thought his job was causing him problems with his hands and wrist, and if he was in the shanty he would simply use the mouse to click on the switch and the switches would line, he wouldn't be pulling any pins.

In light of defendant's eliciting that testimony and making that argument, plaintiff moved for the trial court to provide an assumption of risk instruction to the jury. Over defendant's objection, the trial court read the following instruction to the jury:

> Section 4 of [FELA] provides in part, in an action brought against any common carrier, to recover damages for injuries to any of its employees. Such [sic] employees shall not be held to have assumed the risk of its employment in any case where such injury resulted in whole or part from the negligence of any of

-11-

the officers, agents, or employees of such carrier, and no employee shall be held to have assumed the risk of his employ[ment] in any case where the violation by such a common carrier of any statute enacted for the safety of the employees contributed to the injury . . . or death of such employees.

Defendant argued before the trial court and now on appeal that the assumption of risk jury instruction served only to confuse the jury regarding plaintiff's contributory negligence.

As noted, however, a jury instruction is not error when, "on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Moore*, 279 Mich App at 223 (internal quotation marks omitted). Further, in FELA actions, assumption of risk is not a permitted defense, but contributory negligence can reduce the award of damages. 45 USC 53-54. By repeatedly raising the issue that plaintiff's seniority could have allowed him to take a less physically taxing job, defendant was suggesting to the jury that plaintiff "knowing[ly] and voluntar[ily] accept[ed] a dangerous condition." *Butynski*, 592 F 3d at 279. That argument alone would not trigger an assumption of risk instruction. However, the argument that plaintiff used the wrong posture to pull the track switches or should not have pulled the pin lever so hard to cause vibrations, which relates to whether plaintiff was contributorily negligent, and accordingly, an assumption of risk instruction was appropriate. See *Moore v Detroit Entertainment, LLC*, 279 Mich App 195, 223; 755 NW2d 686 (2008). This case differs substantially from a case where the assumption of risk jury instruction is read but there was nothing at trial to suggest that assumption of risk was at issue. See *Heater v Chesapeake and Ohio R Co*, 497 F 2d 1243, 1249 (CA 7, 1974). Therefore, we conclude that the trial court's jury instructions were properly tailored to ensure that the jury was "fairly and adequately instructed" regarding the parties' arguments and the applicable law. See *Moore*, 279 Mich App at 223.

Affirmed.

/s/ Kathleen Jansen
/s/ Karen M. Fort Hood

-12-