*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

STEVEN R. LILLY,

      Plaintiff-Appellee/Cross-Appellant,

v

GRAND TRUNK WESTERN RAILROAD
COMPANY,

      Defendant-Appellant/Cross-
Appellee.

UNPUBLISHED
January 17, 2019

No. 338677
Wayne Circuit Court
LC No. 16-001908-NO

Before: K. F. KELLY, P.J., and RIORDAN and GADOLA, JJ.

PER CURIAM.

Defendant appeals by right a final judgment following a jury trial on plaintiff's action under the Federal Employers Liability Act ("FELA"), 45 USC 51 *et seq.* We affirm but order remittitur.

## I. BASIC FACTS

Plaintiff alleged that his early-onset osteoarthritis ("OA") requiring bilateral hip replacement was due to repetitive cumulative trauma he experienced during his decades working as a carman for defendant. Plaintiff argued that defendant failed to provide him with a safe working environment. In contrast, defendant argued that plaintiff was provided a safe working environment and that plaintiff's OA was attributed to a congenital hip condition known as femoral acetabular impingement (FAI). The jury found for plaintiff. The trial court denied defendant's many post-trial motions. Defendant now appeals by right.[1]

## II. PLAINTIFFS' EXPERTS

---

[1] Plaintiff has filed a cross-appeal on certain evidentiary rulings. However, because we affirm, we do not need to address plaintiff's cross-appeal.

Defendant argues the trial court abused its discretion when it denied defendant's motions to exclude Dr. Robert Owens Andres as an expert in ergonomics and biomechanics and Dr. Robert Samuel Widmeyer as an expert in orthopedic surgery. We disagree.

> We review the circuit court's decision to exclude evidence for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes. We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules. The admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion. [*Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and footnotes omitted.]

"When a party files a FELA case in state court, we apply federal substantive law to adjudicate the claim while following state procedural rules." *Hughes v Lake Superior & Ishpeming R Co*, 263 Mich App 417, 421; 688 NW2d 296 (2004) (citation omitted). MRE 702 and MCL 600.2955 govern the admissibility of expert witness testimony.

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court's role is that of a gatekeeper and it may "admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), citing *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Similarly, MCL 600.2955 provides, in relevant part:

> (1) In an action for . . .injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.

> (b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

Not all seven factors are relevant in every case. *Elher*, 499 Mich at 27. While each factor is to be considered by the trial court, not every factor must favor the proffering party. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 137; 732 NW2d 578 (2007).

Additionally, a trial court's inquiry when determining admissibility of expert witness testimony is not "whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting *Chapin*, 274 Mich App at 139. "[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217, quoting *Chapin*, 274 Mich App at 139. Instead, the focus is on the scientific validity of the expert's method, not the correctness or soundness of the expert's testimony." *Unger*, 278 Mich App at 217–218 (citation omitted), quoting *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

A. ANDRES

The trial court did not abuse its discretion when it denied defendant's motion to exclude Andres from testifying. Andres received an undergraduate degree in Engineering Science from the University of Michigan ("UM") in 1973, a Master's degree from UM in 1976, and PhD in bioengineering from the UM in 1979. His PhD was funded by NASA and the National Institutes of Occupational Safety and Health ("NIOSH"). Andres did one year of post-doctoral work and was a lecturer at UM for four years. He left in 1984 to work in a joint appointment at the Department of Exercise Science and Industrial Engineering at the University of Massachusetts until 1992. In 1993, Andres incorporated his business – Ergonomic Engineering, Inc. He assisted companies whose employees had an occurrence of muscular or skeletal injuries. Andres published approximately 50 peer review publications.

Andres estimated that he had been in railroad yards more than 150 times and had conducted 29 site inspections for carmen over the years. In fact, Andres received funding from

the Federal Railroad Administration ("FRA") to perform research on the effects of walking on different sized rocks. Andres's June 22, 2016, report concluded:

> The following conclusions have been reached based on my review of the material and my education, training, experience, and background in ergonomics research and the practice of ergonomics with industrial clients:
>
> Performing the job tasks of carmen/car inspectors generally exposes workers to certain ergonomic risk factors (i.e. lifting, walking on uneven surfaces, kneeling and squatting) which generally have been associated with (among other injuries and/or illnesses) cumulative trauma disorders of the lower extremities and specifically the hips. Based on what I have learned and observed, including my knowledge and analysis of Mr. Lilly's work, during the relevant time period, generally Mr. Lilly was exposed to repetitive work in several of his job tasks (e.g. walking on uneven surfaces, squatting or kneeling to replace brake shoes, crawling under cars to chalk tail pin retainer bolts, coupling air hoses). This repetitive work required awkward postures of the lower extremities and involved the exertion of forces to climb, lift, push, pull, and carry.
>
> Generally, to mitigate the effects of certain ergonomic risk factors for cumulative trauma disorders of the lower extremities, it is recommended by OSHA, the AAR, NSC, NIOSH, and GAO[2], and me in my industrial practice, that a company:
>
> 1. Perform an ergonomic screening or job analysis to prioritize jobs for intervention. Based on the materials I have seen at this point, during the relevant time period, [defendant] generally did not perform such an ergonomic screening or job analysis to prioritize jobs for interventions.
>
> 2. Implement engineering (preferably) or administrative controls to decrease worker exposure to ergonomic risk factors by reducing force exertion requirements, improving working positions to reduce awkward posture, or improving working conditions like the walking surfaces. Based on the material I have seen, during the relevant time period, [defendant] generally did not implement such engineering and/or administrative controls. Crew sizes were decreased, no systematic walkway maintenance programs were implemented, and a tool to make it easier to couple air hoses in cold weather (Mertin's bar) was not provided.

---

[2] At a separate motion hearing, the trial court ruled that some of these entities could not be referenced and should be redacted from Andres's report.

3. Administer the following ergonomic training to its employees: ergonomic risk factors for the lower extremity and early signs and symptoms of musculoskeletal disorders. Based on the materials I have seen, during the relevant time period, [defendant] generally did not administer such ergonomic training in the following regard: Mr. Lilly was not trained to recognize lower extremity ergonomic risk factors, and he was not told about early signs and symptoms of musculoskeletal disorders.

Generally, to treat and control certain lower extremity work-related musculoskeletal disorders of a non-traumatic origin, it is recommended by OSHA, the AAR, NSC, NIOSH, the GAO, and me in my industrial practice, that a company implement the following medical management program: utilize symptom surveys, and encourage early reporting of signs and symptoms. Based on the materials I have seen, during the relevant time period, [defendant] generally did not implement such a program in that they never administered symptoms surveys nor did they encourage the early reporting of signs and symptoms.

In summary, for all of the reasons cited above, it is my opinion that [defendant] failed to provide Mr. Lilly with a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices, and, as such, failed to provide Mr. Lilly with a reasonably safe work place.

Defendant's primary argument in the trial court and on appeal is that Andres could not define a threshold level of exposure, which would determine whether and when a carman would develop hip OA. A similar argument was rejected in *Hardyman v Norfolk & Western R Co*, 243 F 3d 255, 265 (CA 6, 2001). In that case, the Sixth Circuit concluded that requiring a plaintiff to establish "a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen [would] essentially . . . foreclose plaintiffs from recovering for [carpal tunnel syndrome ("CTS")] against negligent employers unless their particular job has been the subject of a national, epidemiological study on CTS." It follows that requiring such evidence regarding hip OA would be unduly burdensome on a plaintiff. Here, Andres's opinions were based on peer-reviewed articles addressing the risks associated with repetitive tasks. Andres's methods could be tested but the industry worked to suppress publication of such results. Andres's opinion that cumulative trauma is associated with the risk of OA is generally accepted by the scientific community and other courts have endorsed Andres's methodology. There was support for his theory that plaintiff's hip OA was the result of cumulative trauma.

In *Dixon v Grand Trunk Western RR Co*, 259 F Supp 3d 702 (ED Mich 2016), this same defendant raised a number of similar arguments where the plaintiff claimed that his knee OA was the result of his working conditions. The defendant argued that there was a lack of scientific foundation supporting the plaintiff's expert witness testimony regarding causation. The United States District Court for the Eastern District of Michigan, citing *Hardyman,* determined that expert witness opinions on causation were properly admitted because the plaintiff's expert spoke

with the plaintiff, evaluated the plaintiff's work history and medical history, and then, relying on the expert's expertise, determined "those motions [performed by the plaintiff in the course of his employment with defendant] could likely cause the sort of OA from which [the plaintiff] suffers." *Id.* The same is true here. Andres's opinions were rationally derived from a sound foundation. He interviewed plaintiff, considered plaintiff's medical records, case materials, scientific literature, and other material concerning exposure to ergonomic risk facts. There was no reason to inspect plaintiff's jobsite because Andres properly relied on plaintiff's self-reported history.

The trial court did not abuse its discretion when it denied defendant's motion to strike Andres's testimony.

## B. WIDMEYER

The trial court did not abuse its discretion when it denied defendant's motion to exclude Widmeyer from testifying. Widmeyer is a board certified orthopedic surgeon. He was licensed to practice in Virginia, North Carolina, Florida, and Maryland and had been qualified to testify as an expert in repetitive trauma in each of those states. Widmeyer treated a number of railroad workers for acute injuries over the years. He first learned of the concept of cumulative trauma injury in medical school in 1964. Widmeyer personally examined plaintiff and reviewed all of his records. Widmeyer also reviewed deposition transcripts and plaintiff's job description. He made the following observations:

> The first is there is no question at all that Mr. Lilly's work tasks during his decades of employment with the Railroad have far exceeded the limits that his hip joints could withstand. As a result at a very young age he has experienced progressive and complete destruction of his hip joints from those activities . . .

> He is clearly unable to do his regular work and the restrictions placed on him by his orthopedic surgeon will remain permanent.

> He has no other risk factors that would contribute to the early destruction of the joints such as family history of arthritis, any underlying arthritic or other disease processes, and he has had no specific acute trauma to either hip joint from a single event, merely the repetitive overactivity of the joints placed under an abnormal strain and in unusual positions.

> His situation is very simplistic. His activities with the Railroad have been entirely responsible for the destruction of his hip joint, and therefore all of the treatment of hip joints related to his Railroad employment, and any future treatment that he may require regarding his hip joints will be related to his employment with the Railroad.

Widmeyer testified that there were peer review journal articles and trade publications that supported the concept of cumulative trauma disorder as a cause of arthritis. Widmeyer testified that "repetitive injury has been going on forever and it still is." Widmeyer had opportunities to observe carmen performing their tasks in railroad yards. He also had an opportunity to walk on mainline ballast. The ballast put undue stress on the lower extremities. Likewise, kneeling and

twisting extended the joints past the neutral position and caused torqueing. Specifically, in terms of plaintiff, Widmeyer calculated over his 15 years working as a carman, plaintiff performed four million squats inspecting railcar and six million squats inspecting the autorack, which was "excessive and repetitive."

Plaintiff, whom Widmeyer personally examined, was not obese or overweight. He was relatively young at age 54. Widmeyer concluded that "the massive overuse of his hip joints in abnormal positions with abnormal loadings day after day after decade after decade simply wore the joints down." As for the theory that plaintiff suffered from FAI, Widmeyer opined that plaintiff would have had problems much sooner if he had FAI. Widmeyer believed that it was a contributing cause of plaintiff's problems and that he had it at the time he had his arthritis. However, while defendant's expert suggested that the FAI caused the osteoarthritis, it was Widmeyer's opinion that the OA caused the impingement. Plaintiff had a gradual destruction of the hip joints and the cartilage wore down.

As with Andres, the trial court properly concluded that Widmeyer's testimony was not based on junk science. Widmeyer spoke with plaintiff, evaluated plaintiff's work history and medical history, and then, relying on his own medical expertise in treating patients with OA, determined that plaintiff's work tasks during his decades of employment with defendant far exceeded the limits that his hip joints could withstand.

The trial court did not abuse its discretion when it denied defendant's motion to strike Widmeyer's testimony.

## III. DEFENDANT'S MOTIONS FOR DIRECTED VERDICT AND JNOV

Defendant argues that plaintiff's case should have been dismissed, given the absence of evidence that defendant knew or should have known that plaintiff's work environment was unreasonably unsafe. We disagree.

> This Court reviews de novo the trial court's decisions on a motion for a directed verdict and a motion for JNOV. A directed verdict is appropriate only when no factual question exists on which reasonable jurors could differ. The appellate court reviews all the evidence presented up to the time of the directed verdict motion, considers that evidence in the light most favorable to the nonmoving party, and determines whether a question of fact existed. In reviewing the decision on a motion for JNOV, this Court views the testimony and all legitimate inferences drawn from the testimony in the light most favorable to the nonmoving party. If reasonable jurors could honestly have reached different conclusions, the jury verdict must stand. [*Diamond v Witherspoon*, 265 Mich App 673, 681–82; 696 NW2d 770, 776 (2005) (citations omitted).]

Under FELA:

> Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier. [45 USC 51.]

"[W]hen Congress enacted FELA in 1908, its attention was focused primarily upon injuries and death resulting from accidents on interstate railroads. Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the human overhead of doing business from employees to their employers." *Consol Rail Corp v Gottshall*, 512 US 532, 542; 114 S Ct 2396, 2403–2404; 129 L Ed 2d 427 (1994) (citation and quotation marks omitted). To effectuate this remedial goal, "a relaxed standard of causation applies under FELA." *Id.* FELA's language on causation is "as broad as could be framed," and "the test of a jury case is simply whether the proofs justify with reason the conclusion that the employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *CSX Transp, Inc, v McBride*, 564 US 685, 691–692; 131 S Ct 2630; 180 L Ed 2d. 637 (2011) (citations omitted).

"A railroad has a duty to use reasonable care in furnishing its employees with a safe place to work." *Atchison, Topeka & Santa Fe R Co v Buell,* 480 US 557, 558; 107 S Ct 1410; 94 L Ed 2d 563 (1987). The FELA is not, however, a workers' compensation statute; rather, the basis of an employer's liability "is his negligence, not the fact that injuries occur." *Gottshall*, 512 US at 543. What constitutes negligence under the FELA is a federal question that "generally turns on principles of common law." *Id.*

To prevail under the FELA, a plaintiff need not show that the employer had actual notice of a dangerous condition in the workplace. *Szekeres v CSX Transp, Inc,* 617 F3d 424, 430–431 (CA 6, 2010). "The law is clear that notice under the FELA may be shown from facts permitting a jury to infer that the defect could have been discovered by the exercise of reasonable care or inspection." *Id.* at 430.

> Reasonable foreseeability of harm . . . is indeed an essential ingredient of FELA *negligence*. The jury, therefore, must be asked, initially: Did the carrier fail to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances? In that regard, the jury may be told that the railroad's duties are measured by what is reasonably foreseeable under like circumstances. Thus, if a person has no reasonable ground to anticipate that a particular condition . . .would or might result in a mishap and injury, then the party is not required to do anything to correct the condition. If negligence is proved, however, and is shown to have *played any part, even the slightest, in producing the injury,* then the carrier is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable. [*CSX Transp,* 564 US at 703–704 (footnotes, citations and quotation marks omitted).]

"The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make the inference" that the negligence of an employer played any part in causing the injury at issue. *Rogers v Missouri Pacific R Co*, 352 US 500, 508; 77 S Ct 443; 1 L Ed 2d 493 (1957).

The trial court correctly determined that knowledge was a matter for the jury to decide. In his report, Andres opines that:

The [Association of American Railroads ("AAR")] also evaluated an ergonomics process to advance safety at the railroads (*Ergonomics Programs at Heavy, Industrial Corporations*, AAR Research and Test Department, by P. McMahan and G. Page, February, 1994). The process involved six major elements:

1. Define and design the work processes,

2. Worksite analysis and monitoring,

3. Analysis of possible problems and solution options,

4. Implementation of solutions,

5. Training and education, and

6. Medical management.

Andres then reviewed the commonly accepted ergonomic risk factors for the lower extremities and how OA has been associated with occupational activities like those plaintiff experienced. Andres noted that defendant could have screened for the presence of known risk factors, but failed to do so. In fact, the industry resisted ergonomics. Andres concluded that defendant: (1) failed to perform a systemic worksite analysis as part of a comprehensive safety and health program taking ergonomics into consideration; (2) failed to implement systematic hazard prevention and control as part of a comprehensive safety and health program taking ergonomics into consideration; (3) failed to provide medical monitoring of employees for musculoskeletal disorders and intimidated those from reporting early signs and symptoms of musculoskeletal disorders, thereby failing to implement a medical management program with ergonomics in mind; and, (4) failed to provide effective training to understand what cumulative trauma was or to recognize early signs. He concluded that defendant "failed to provide Mr. Lilly with a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices, and, as such, failed to provide Mr. Lilly with a reasonably safe work place."

The trial court properly denied defendant's motion for directed verdict and JNOV, leaving the issue of notice for the jury to decide.

## IV. PRECLUSION

Defendant argues that plaintiff's ballast claims were precluded by the Federal Railway Safety Act ("FRSA"), 49 USC 20101 *et seq*. We disagree.

"Whether a federal law preempts a state law or precludes another federal law is a question of law which we review de novo." *Nickels v Grand Trunk W RR, Inc*, 560 F3d 426, 429 (CA 6, 2009).

Defendant relies primarily on the *Nickels* decision. The plaintiffs in *Nickels* each claimed that the defendant railroads failed to provide a safe working environment by using large mainline ballast underneath and adjacent to tracks with heavy foot traffic. *Nickels*, 560 F 3d at 428. The

-9-

district courts granted the defendants' motion for summary judgment, finding that the plaintiffs' FELA claims would undermine the FRSA's express intent to achieve national uniformity in railroad safety regulations. *Id.* The Sixth Circuit had to examine the interplay between FELA and FRSA, both of which are designed to promote railway safety. FELA provides work safety to railroad employees while FRSA seeks to promote safety in every area of railroad operations to reduce accidents. *Id.* at 429. The FRSA contains a preemption clause in order to ensure that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 USC 20106(a)(1). The preemption clause provides that the states may regulate railroad safety "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 USC § 20106(a)(2). As to ballast, the FRSA provides:

> Unless it is otherwise structurally supported, all track shall be supported by material which will—
>
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
>
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
>
> (c) Provide adequate drainage for the track; and
>
> (d) Maintain proper track crosslevel, surface, and alinement. [49 CFR 213.103.]

Citing *Lane v RA Sims, Jr, Inc,* 241 F 3d 439, 443 (5th Cir 2001) and *Waymire v Norfolk & W Ry Co,* 218 F 3d 773, 776 (7th Cir 2000), the Sixth Circuit confirmed that the uniformity demanded by the FRSA can only be achieved if the regulations are applied similarly to FELA claims. *Nickels,* 560 F 3d at 430. The Court added that although "*Lane* and *Waymire* addressed FELA claims of unsafe train speed in light of FRSA speed-limit regulations, the FRSA's concern for uniformity leads us to reach the same conclusion regarding ballast regulations. And while railroads may face a lesser likelihood of state-law claims alleging negligent ballast composition, any exposure to conflicting standards undermines uniformity." *Id.* Therefore, "the plaintiffs' claims are precluded by the FRSA if they would have been preempted if brought by a non-employee under state law." *Id.*

The *Nickels* Court concluded that regulation 49 CFR 213.103 covered the subject matter of the plaintiffs' claims. It noted that "[r]ather than prescribing ballast sizes for certain types or classes of track, the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issue of ballast size." *Nickels,* 560 F3d at 431. The Court further noted that there need not be any inconsistency for pre-emption to apply: "the fact that track stability and safe footing are not mutually exclusive does not mean that § 213.103 has not covered the subject of ballast size. Preclusion and preemption under the FRSA are not limited to situations where the federal or state standard is incompatible with a regulation." *Nickels,* 560 F3d at 431–432.

As the parties note, *Nickels* has not been uniformly applied, with some courts following *Nickels* and other declining to do so. Plaintiff notes that, regardless, *Nickels* has been abrogated

by *POM Wonderful LLC v Coca-Cola Co*, 573 US 102; 134 S Ct 2228; 189 L Ed 2d 141 (2014). However, even if we found that *POM* had no impact on *Nickels*, defendant is not entitled to relief on this issue. Specifically, plaintiff never alleged that defendant used improper ballast. Instead, the issue was raised by defendant's motion in limine and further addressed by their own expert. Plaintiff's counsel did not reference ballast in his opening or closing statements. While there was testimony of the difficulty on walking on different sized ballasts, the focus at trial was whether squatting, bending, kneeling, and awkward positions placed undue weight on plaintiff's hips, contributing to his hip OA. Plaintiff alleged that defendant failed to provide a reasonably safe workplace for reasons beyond the issue of ballast. Plaintiff did not suggest that the ballast was inappropriate; he suggested that defendant failed to provide a reasonable safety and health program that dealt with ergonomic issues. The trial court instructed the jury regarding plaintiff's theory of the case:

> Plaintiff, Steven Lilly, alleges that Defendant, Grand Trunk Western Railroad Company, at the time and place in question was negligent in the following particulars.
>
> That Grand Trunk Western Railroad Company through its employees or agents failed to provide Plaintiff Steven Lilly with a reasonably work safe place by failing to implement a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices.
>
> Including but not limited to a failure to perform an ergonomic screening or job analysis, failing to increase engineering or administrative controls, to decrease worker exposure to ergonomic risk factors.
>
> Failing to train employees on ergonomic risk factors of the lower extremities, and early signs and symptoms of musculoskeletal disorders, and by failing to provide appropriately empowered and appropriate tools to perform his work task in a reasonably safe manner.

Defendant is not entitled to relief on this issue regardless of whether the FRSA precluded reference to ballast size and suitability.

## V. JURY INSTRUCTIONS

## A. STANDARD OR REVIEW

"We review a trial court's decision regarding jury instructions for an abuse of discretion." *Alfieri v Bertorelli*, 295 Mich App 189, 196; 813 NW2d 772 (2012). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

"[J]ury instructions must be reviewed as a whole, rather than extracted piecemeal to establish error in isolated portions." *Hill v Sacka*, 256 Mich App 443, 457; 666 NW2d 282 (2003) (internal quotation marks omitted). "There is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the

-11-

jury." *Id.* at 457–458. Reversal is not required unless failing to do so would be "inconsistent with substantial justice." MCR 2.613(A).

## B. PLAINTIFF'S ALLEGED PRE-EXISTING CONDITION

Defendant argues that the trial court impermissibly failed to instruct the jury about the effect of plaintiff's pre-existing FAI.

The trial court did not abuse its discretion when it refused to give defendant's requested instructions because defendant's expert testified that plaintiff's alleged pre-existing FAI would have resulted in his hip OA *regardless* of what he did at work. Therefore, defendant denied playing *any* part in causing plaintiff's injuries. Moreover, the jury was properly instructed that it could not find for plaintiff if it did not first conclude that defendant's negligence caused or contributed to his injury. The trial court instructed the jury:

> In order to prove the essential elements of Plaintiff Steven Lilly's claims against Defendant, Grand Trunk Western Railroad Inc, Plaintiff Steven Lilly has the burden to establish by a preponderance of the evidence in this case the following facts.

> First, that Defendant Grand Trunk Western Railroad, Inc was negligent in one or more of the particulars alleged.

> And 2, that Defendant Grand Trunk Western Railroad's negligence caused or contributed in whole or in part to some injury and consequent damage sustained by Plaintiff, Steven Lilly.

The jury was, therefore, equipped with the knowledge that defendant could not be negligent if it did not cause plaintiff's injury.

## C. SPECIAL INSTRUCTION ON DOSE RESPONSE

Defendant argues that the trial court's instruction concerning dose response was harmful error and that the jury should have been allowed to consider the lack of a dose response relationship. We disagree.

At plaintiff's request, the trial court instructed the jury:

> A plaintiff does not have the burden of proving causation by producing medical studies involving railroad workers or studies which establish a base level of exposure which will cause a worker to develop a medical condition when that level will always vary from individual to individual.

> Stated more succinctly, Plaintiff does not need to prove a dose response relationship.

Defendant takes this opportunity to repeat the causation arguments previously rejected. Defendant's primary argument in the trial court was that plaintiff could not define a threshold

level of exposure where a carman would develop hip OA. A similar argument was rejected in *Hardyman*. In that case, the Sixth Circuit concluded that requiring a plaintiff to establish "a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad [brakemen would] essentially . . . foreclose plaintiffs from recovering for [carpal tunnel syndrome ("CTS")] against negligent employers unless their particular job has been the subject of a national, epidemiological study on CTS." *Hardyman*, 243 F 3d at 265. It follows that requiring such evidence regarding hip OA and an instruction thereon would have been inappropriate.

## D. ASSUMPTION OF RISK

Defendant argues that the trial court improperly instructed the jury on assumption of the risk because assumption of risk is not a defense under FELA. We disagree.

45 USC 54 clearly provides that assumption of the risk is not a defense to a FELA action. The statute provides:

> In any action brought against any common carrier under or by virtue of any of the provisions of [FELA] to recover damages for injuries to . . . any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury . . . resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury . . .of such employee.

However, FELA does allow for an employer to argue that a plaintiff's own negligence contributed to his or her injury, and that any jury award should be reduced by that amount. 45 USC 53 provides:

> In all actions . . . brought against any such common carrier by railroad under ... any of the provisions of [FELA] . . . the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.

Therefore, plaintiff cannot be found to be negligent for continuing his work even if he is aware of defendant's negligence, but plaintiff can be found contributorily negligent.

"The statutory elimination of the defense of assumption of risk, when read to the jury in FELA cases where that 'defense' has been neither pleaded nor argued, serves only to obscure the issues in the case." *Heater v Chesapeake & Ohio R Co*, 497 F 2d 1243, 1249 (CA 7, 1974) (internal quotation marks omitted). However, where the issue of assumption of risk has been raised, and the jury might face confusion regarding the difference between contributory negligence and assumption of risk, the assumption of risk jury instruction is properly given in FELA cases. *Tersiner v Union Pacific R Co*, 947 F 2d 954 (CA 10, 1991).

The assumption of risk jury instruction was properly given by the trial court where defendant raised the issue during trial. During cross-examination, plaintiff acknowledged that the physical tasks came with the territory of being a carman. Defendant appeared to suggest that plaintiff knowingly and voluntarily accepted a dangerous condition.

## VI. DAMAGES

Defendant argues that the jury ignored the trial court's instruction to reduce their verdict to present day value. Defendant maintains that the trial court should have granted defendant's motion for new trial and reduced the verdict to present value in the final judgment. We agree.

Excessive damages "influenced by passion or prejudice" can form the basis of a new trial. MCR 2.611(1)(d). "Alternatively, a trial court may offer the prevailing party an opportunity to consent to judgment in the highest amount the court finds is supported by the evidence." *Heaton v Benton Const Co*, 286 Mich App 528, 538; 780 NW2d 618 (2009). "This Court reviews a trial court's decision regarding a motion for remittitur or a new trial for an abuse of discretion." *Id.* "An abuse of discretion occurs when a court chooses an outcome that is outside the range of principled outcomes." *Id.*

During closing arguments, plaintiff's counsel discussed the total economic loss plaintiff had suffered :

> But Column 3, all right, Column 3, is what Mr. Lilly's past wage loss is. And if you add up those, and if you need a calculator, we can get you a calculator. But if you add up 51 to 55, you're going to come up with $252,502.

> And if you calculate his future wage loss from 2017 'til the time he's 65, you're going to come up with a total of $1,015,285. That's the economic loss. That's the total economic loss.

And when discussing Question #4 of the Verdict Form during closing arguments, plaintiff's counsel urged:

> Four, what is the total amount of Plaintiff's damages that he has sustained? Well I suggest to you that 1,015,285 is the economic loss. I suggest to you that $1,500,000 is the compensation for the loss of his health, the loss of his vitality, the loss of his involvement with his family.

> So if you add those two up you've got 1.5 million and you've got $1,015,285, and I could do it on the pad but I's, I'll do it in my head, okay. It's $2,515,285.

The trial court then instructed the jury:

> If you find that Plaintiff Steven Lilly is reasonably certain to lose earnings in the future, then you must determine the present value in dollars of such future damages since the award of future damages necessarily requires that payment be

made now in one lump sum, and Plaintiff Steven Lilly will have use of the money now for a loss that will not occur until some future date.

You must decide what those future loses [sic] will be and then make a reasonable adjustment for current value.

The jury calculated plaintiff's damages at $2,515,285. The jury verdict form did not ask the jury to provide separate awards for economic and non-economic damages. It simply provided: "QUESTION NO. 4: What is the total amount of plaintiff's damages plaintiff has sustained?" The jury answered $2,515, 285.

"[T]he adequacy of the amount of the damages is generally a matter for the jury to decide." *Heaton*, 286 Mich App at 538. "[A] verdict should not be set aside merely because the method the jury used to compute damages cannot be determined." *Id.* Here, there is no room for guesswork. Clearly, the method the jury utilized was that suggested by plaintiff's counsel – adding economic damages ($1,015,285) to non-economic damages ($1,500,000) for a grand total of $2,515, 285. The jury obviously failed to follow the trial court's instruction to reduce damages to present value. The award should be reduced to reflect plaintiff's expert's conclusions that plaintiff's loss of future earnings – reduced to present value – is $947,355 –a difference of $67,930. Pursuant to MCR 2.611(E)(1), the trial court abused its discretion in failing to reduce the award.

Affirmed in part, reversed in part, and remanded to grant remittitur. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan
/s/ Michael F. Gadola

-15-